## 30538.  BELL v. THE STATE.

DECIDED JUNE 22, 1944.  REHEARING DENIED JULY 20, 1944. .

*Wyatt & Morgan, Wright Lipford,* for plaintiff in error.

*L. L. Meadors, solicitor-general, J. L. Smith,* contra.

GARDNER, J.  The defendant was convicted of involuntary manslaughter in the commission of an unlawful act.  He filed a motion for a new trial on the general grounds, and afterwards added twelve special grounds.  The court overruled the motion, and the defendant assigns error on that judgment.

■  As to the general grounds, the brief of evidence covers approximately one hundred pages.  After a careful study of it we are convinced that it would serve no good purpose to give it in detail here in order to determine whether the verdict rendered should be reversed.  The State introduced one apparently disinterested eyewitness who testified as follows:  "When my car drowned out I got out and went back to the Bell filling station and asked a lady who was in there could I use the telephone.  I didn't know Mr. J. H. Bell; I didn't know anybody—not a soul in the store. Bettie went with me in there.  I went in the business part.  When

I got in the station and asked could I use the telephone I could see the telephone. It was in a little window cut in the partition of this filling station. You could use it from the residence side and the filling station side. I called Mr. Houston, and from the information I got from him I called Mrs. Williams's home, and called for my husband. He never did get to the 'phone. Mrs. Williams answered the 'phone. I called for my husband. I heard him coming down the steps; I was holding the 'phone; I had the 'phone to my ear like that (indicating), and a shot went off, some kind of noise. I thought it was a firecracker. I heard this girl scream. She screamed. I had the telephone to my ear like that, and I saw a man with a pistol in his hand pointed directly at the girl. The girl was going down to the floor. Some young girl caught her as she fell; some young lady caught her as she fell. I didn't hear but one shot. If there was any more I didn't hear it. As to how many people I saw in that room, I answer I saw the man that shot the girl—that held the gun. The girl was falling, and the other girl caught her. That is only three I saw. Q. Towards whom was the gun pointed when you looked in just immediately after the shot was fired? A. Pointed at the girl, the falling girl. Q. Take this gun in your hand like the man had it, pointed towards me, as he had it, show us how he held the gun. A. Must have had it like that (indicating). This is the position I recollect the gun was being held (indicating). Q. How far was he from you? Tell me when to stop. A. Closer, just about this way (indicating). I would say that is about three feet. I didn't hear anything said in the room. I wasn't listening at anything. I didn't hear them say anything. After the shot was fired I dropped the receiver. That was all that I saw."

The deceased, the daughter of the defendant, died from the wound shortly after it was inflicted. There was evidence throughout the record from which the jury could have inferred that at the time of the homicide the defendant was very much under the influence of intoxicating liquor. There was also evidence to the effect that on a number of occasions previous to the homicide, and within a few weeks of it, the defendant while in an intoxicated condition had difficulties with his family, and on those occasions had his gun out. The evidence reveals that at least on one occasion he was pointing his gun at his wife, threatening to kill her, and that

432

the deceased and her sisters had remonstrated with him and had endeavored to get the pistol from him in order to prevent his using it. On this particular point a witness who was present on that occasion testified: "Q. What did he tell Miriam [meaning his daughter, the deceased,] he was going to do with the gun then? A. He told her he was going to kill his wife. . . He told this girl he was going to kill his wife, this girl's mother. Miriam was trying to take the gun away from him. She had her hands on his trying to keep him from taking her in the other room. As to who else was there besides me and Miriam, I answer, Mildred and Mary and Harry Orr was there in the store. I was standing in the yard. I was standing between him and his wife with the gun, and he asked me to move out of his way. So I did, and went around in the store. Q. When you were standing out in the yard was when Mary was trying to take the gun out of his hand? A. She was in the house. He was pointing the gun towards his wife. I was on the outside. Q. When, or at the time Miriam was trying to take the gun away from him, tell whether he was putting his hands on her? A. He was pushing her down. He told her to get out of his way. He was drinking at that time. Q. Have you been present when similar conduct occurred in your presence on other occasions? A. Not right in my presence. They had been scuffling over the gun when he was drinking twice. I saw it. In reply to the question, 'How many times have you seen him with his gun out and scuffling with him over the gun?' A. Quite a few times. I saw him at least a half dozen times. Two weeks before that they were scuffling over the gun. He was wanting to take the gun, and go somewhere to kill somebody. He was drinking at that time. There were several times just like that."

The defendant in his statement and by the introduction of considerable evidence, contended that the pistol was accidently fired; that he did not intentionally point or aim the pistol at and toward the deceased. From the evidence which we have quoted above from the record, in connection with all the facts and circumstances of the case, the evidence warranted the charge by the court to the jury the law on the question of involuntary manslaughter while in the commission of an unlawful act, that is, while intentionally and illegally pointing a pistol at another. Under this record, reflecting the condition of the defendant, and his previous conduct, we are

lead to believe that the jury took a very charitable view toward the defendant. Doubtless this was due to the fact that when he realized what he had done, his punishment beyond the law was hardly endurable. It is earnestly urged by counsel for the defendant, and with force, that the State's witness did not see the pistol pointed at the deceased until after the pistol fired, but what she heard and saw was a part of the res gestæ and was in such close succession that in connection with the other evidence, as we have stated, it is sufficient to sustain the verdict. The defendant introduced a number of witnesses, photographs, and calculations, in an effort to discredit or impeach the testimony of the State's witness. This evidence was to the effect that it was impossible for the witness to have seen the defendant and the deceased from where she was standing at the time the shot was fired. We have studied this record carefully as to this point, and have come to the conclusion that it was a jury question as to whether the witness could see, as she testified, while standing at the telephone. The jury settled this issue adversely to the accused. As to whether or not manslaughter was involved, under the record, we are convinced that it was. If it were doubtful, under the evidence, it was the duty of the trial court to charge involuntary manslaughter in the commission of an unlawful act, and let the jury decide the grade. *Booker* v. *State,* 153 *Ga.* 117 (111 S. E. 418); *Drane* v. *State,* 147 *Ga.* 212 (93 S. E. 217); *Gamble* v. *State,* 58 *Ga. App.* 637 (199 S. E. 662); *Thomas* v. *State,* 51 *Ga. App.* 455 (2) (180 S. E. 760). The court did not err in denying the motion for new trial for any of the reasons assigned, so far as the general grounds are concerned.

■ Special ground 1: The court, at the instance of the State, sustained an objection that Mrs. Bell, wife of the defendant, told a witness that after the shooting she put the pistol away. It is contended that this denied the defense the right of a thorough and sifting cross-examination under the Code, § 38-1705. This was purely hearsay testimony. Moreover, the statement from the wife of the accused was made outside the presence of the defendant and was not a part of the res gestæ. *Bowen* v. *State,* 36 *Ga. App.* 666, 667 (137 S. E. 793). This section does not empower the opposite party to get before the jury illegal testimony. The court did not err in sustaining the objection.

■

■   Special ground 2:   During the progress of the trial the sheriff testified concerning the intoxicated condition of the defendant at the scene of the homicide, and stated that it was necessary to assist him, while under arrest, to the sheriff's automobile. On cross-examination counsel for the defendant endeavored to get before the jury that it was at the funeral on Sunday following Friday, the day of the homicide, at a time when the defendant was not intoxicated, that an effort was made to carry the defendant from the church to the car.   The court excluded this testimony. Error is assigned (a) because it abridged the right of cross-examination, and (b) because it illustrated that the defendant was not drunk on the day of the homicide, since his condition on the day of the funeral was similar.   As to assignment (a), we have dealt with that phase immediately above.   As to the other assignment, it was clearly inadmissible as being self-serving. *Dixon* v. *State,* 116 *Ga.* 186 (2) (42 S. E. 357); *Sasser* v. *State,* 129 *Ga.* 541 (2) (59 S. E. 255).

■   Special ground 3 assigns error because the court admitted evidence to the effect that on previous occasions the defendant had been seen at his home in an intoxicated condition with his pistol, pointing it at a member of his family, threatening to take human life, and on such occasions his children would endeavor to get his pistol away from him.   The only assignment of error is, that this evidence was prejudicial and illegal.   This evidence, illustrating the conduct of the accused while under the influence of intoxicating liquor on other occasions, was admissible, (1) to show motive, (2) to show intent, (3) to show the absence of mistake or accident. In *Lee* v. *State,* 8 *Ga. App.* 413 (3) (69 S. E. 310), this court held:   "Where knowledge, motive, intent, good or bad faith, and other matters dependent upon a person's state of mind, are involved as a material element in a particular criminal offense for which a defendant is on trial, and the defendant has engaged in a course of conduct or done other acts at or about the same time the act in question was committed, and these other transactions are such as to illustrate the state of the defendant's mind on the subject involved, proof of them may be received, though one or more of the separate acts of which this collateral conduct consists may be criminal."   The conduct of the accused on the previous occasions was similar to his conduct on the day he killed his

daughter. He claimed the killing was an accident. It was proper for the jury to consider his previous conduct in determining whether or not it was an accident, or was a result of one of his traits of illegally pointing his pistol at a member of his family.

■ Error is assigned under special ground 4 because the court refused to admit testimony that the deceased was sickly and for that reason received a greater degree of affection from the accused than his other children received. The exclusion of this testimony is assigned as error because it tended to show that the accused had no motive for taking the life of his daughter. Since the verdict is for homicide without any intention to kill, this assignment is clearly without merit.

■ In special ground 5, error is assigned because the court admitted in evidence, over objection of the defendant, a diagram or plat of the house where the homicide occurred. The witness testified that the diagram or plat was substantially a true reproduction of the building, although it was drawn from memory and not drawn to scale. This assignment is without merit. In *Moon* v. *State,* 68 *Ga.* 687 (2), the Supreme Court said: "A diagram illustrating the scene of the crime, having been proved by witnesses to be correct, was admissible. That witnesses for the defense denied its correctness, did not render it inadmissible. The defendant could introduce a diagram in accordance with their testimony if he so desired."

■ Special grounds 6 and 7 complain because the court admitted testimony as to certain tests and experiments which witnesses had made with the gun with which the accused inflicted the mortal blow. This testimony tended to show that the gun could not have been accidently fired in accordance with the defendant's contention. The objections urged were that the testimony was hearsay, not at the scene of the crime, nor in the presence of the defendant. These assignments are without merit. In the case of *Wynes* v. *State,* 182 *Ga.* 434 (4) (185 S. E. 711), the Supreme Court, citing approvingly *Bell* v. *State,* 164 *Ga.* 292 (138 S. E. 238), stated in substance that the admission or exclusion of such testimony rested largely within the discretion of the trial judge, and that his judgment thereon would not be disturbed unless he abused his discretion. We find no abuse of discretion under the assignments in the instant case.

■ Special ground 8 complains of an excerpt from the charge as it related to murder. Conceding, but not deciding, that this contention is correct, it is harmless because the verdict was for involuntary manslaughter, a lesser crime. *Carver* v. *State,* 105 *Ga.* 461 (30 S. E. 433); *Davis* v. *State,* 114 *Ga.* 104 (39 S. E. 906).

■ Special ground 9 complains because the court submitted to the jury the principles of law as applied to involuntary manslaughter in the commission of an unlawful act. The assignment of error is that the evidence did not warrant such charge. This contention is without merit for the reason set out in the first division of the opinion.

■ Special ground 10 complains because the court in its charge stated that if the jury found the defendant guilty of involuntary manslaughter in the commission of an unlawful act it would be their duty to fix his punishment at not less than one nor more than three years in the penitentiary, and if they found him guilty of involuntary manslaughter in the commission of a lawful act without the observance of due caution and circumspection, he would be punished as for a misdemeanor by the court. It is the contention that the court should have defined to the jury the meaning of a misdemeanor sentence. If the defendant had desired a fuller charge in this respect, it should have been requested in writing. This ground is without merit.

■ Special ground 11, which assigns error as to the charge of the court concerning the sentence, is manifestly without merit.

■ Special ground 12 complains because after the jury had been out about five minutes the court recalled them and informed them that he had overlooked one principle of law which he wished to give them in charge, and that was the principle that it was un-lawful for one to intentionally point and aim a gun or pistol at another whether loaded or unloaded, etc.; and that when they returned to their deliberations they might take this principle of law, along with the other charge of the court, in considering the question of whether or not the accused was guilty of involuntary manslaughter in the commission of an unlawful act. It is contended that this recharge was prejudicial to the accused, and unlawful—prejudicial because it impressed upon the minds of the jurors the offense of involuntary manslaughter in the commission of an un-

lawful act, and unlawful because there was no grade of manslaughter in the case as made by the evidence. In view of the whole charge and the record in the case, this assignment of error does not require a reversal for any of the reasons assigned.

The court did not err in overruling the motion for a new trial for any of the reasons assigned in either the general grounds or the special grounds.

*Judgment affirmed. Broyles, C. J., and MacIntyre, J., concur.*